(January 18, 1990)

■ OMNIVEST INCORPORATED, Respondent, v ELDERS FUTURES, INC., et al., Appellants.—Order of the Supreme Court, New York County (Harold Baer, Jr., J.), entered on February 9, 1989, which, *inter alia,* denied the motion of defendants-appellants to dismiss the complaint for failure to state a cause of action (CPLR 3211 [a] [7]), unanimously reversed, on the law, the motion granted, and the complaint dismissed, without costs.

Plaintiff-respondent Omnivest Inc. seeks damages from defendant-respondent Elders Futures, Inc., and its president, Gene Donney, representing lost future commissions that would allegedly have been earned from the Lombardfin Securities Underwriters, Ltd. (LSU), a Swiss corporation that was Omnivest's largest customer until "Black Monday", October 19, 1987. Plaintiff asserts that because of the trading losses discussed below, LSU is no longer a customer of Omnivest.

Omnivest acted as introducing broker for LSU. Elders is a futures commission merchant and acted as clearing broker. Additionally, Lombardfin, S.P.A. acted as introducing broker for LSU, and margin calls for LSU were transmitted through Lombardfin. Neither LSU nor Lombardfin are parties to this action.

Throughout 1987, LSU implemented a heavily margined program trading strategy through Lombardfin, Elders, and Omnivest. The transactions were governed by a customer agreement between LSU and Elders, and an introducing broker agreement between Omnivest and a predecessor firm to Elders, which was assumed by Elders. Commissions were divided between Omnivest and Elders by formula. On the Friday before Black Monday, the LSU account held two futures positions through defendant Elders, one in precious metals futures on the New York Commodities Exchange, and one based on the New York Stock Exchange composite index, traded on the New York Futures Exchange (NYFE). Allegedly these two positions were allied and intended as a hedge, the strategy being that as the stock index goes lower the precious metals prices rise. It is alleged that this program trading strategy was well known to Elders and Donney.

On "Black Monday", when the New York Stock Exchange composite index fell 500 points, defendants allegedly stopped accepting orders for NYFE contracts and accepted only liquidation orders "to protect clients from themselves." Thereafter, despite assurances from Lombardfin that all margin call amounts would be paid the next day, Edlers liquidated all NYFE positions held by LSU, despite Lombardfin's expressed instruction to increase the NYFE position, and did not liquidate the allegedly allied precious metals position. According to the complaint, defendant Donney inferred from the communications that LSU would be unable to meet the margin call the next day and he "simply panicked." Omnivest alleges that all past margin calls were always timely met by LSU, and that LSU had offered previously to post a letter of credit to cover margin calls but had not actually done so because Elders had not responded to its request to fix an amount. Omnivest also states that LSU was financially able to meet the margin call, and that the banks in Italy were closed at the time Lombardfin received notice of the margin call. Additionally, Omnivest alleges in rebuttal that defendant Donney was attempting to cut Omnivest out as introducing broker and deal directly with LSU by being a "hero" and salvaging LSU's position, but

guessed wrong by selling the stock futures and retaining the metals futures.

At 12:30 P.M. on Monday, Lombardfin was notified that as of the close of business on Friday it had a margin call of $80,250. By late in the day on Monday, when LSU had not met the $80,250 margin call, and while stock prices were plunging, Elders liquidated the NYFE position. NYFE rule 305 (c) prescribes one hour as the "reasonable" time within which a margin call must be met before a futures commission merchant should exercise its broad discretion under a customer agreement and liquidate a position to meet a margin call. Unfortunately for all the players here, after the stock futures were liquidated, the value of the stock futures rose and metals plummeted. By the time Elders liquidated the now unhedged metals position, LSU faced a margin call of nearly $1,000,000.

We hold that on this record the actions of Elders and its president do not breach any legal duty, either in contract or tort, owed to Omnivest. Plaintiff alleges that defendants' refusal to increase the futures position and its partial liquidation of the allied positions constituted "unauthorized trading", and that defendants took over the account and are thus responsible for the losses. While we need not decide LSU's rights, the provisions of the two agreements appear to authorize defendants' actions. Paragraph 4.1 of the introducing broker agreement between Omnivest and Elders gives Elders the right to refuse to accept any order at any time for any reason. Paragraph 8 of the customer agreement between LSU and Elders authorizes Elders, in its absolute discretion, to "cancel any outstanding orders or close any position in order to close out the Account or Accounts in whole or in part". The exercise of such unfettered discretion has been upheld. *(See, Geldermann & Co. v Lane Processing,* 527 F2d 571 [8th Cir 1975]; *Hutton & Co. v Burkholder,* 413 F Supp 852 [Dist Ct, DC 1976]; *Jeming v Carl Assocs.,* Comm Fut L Rep [CCH] § 24,444.)

Our holding is expressly limited to determining the rights of Omnivest on this record. Even if all the allegations against Elders and Donney contained in the complaint were proved, as they are deemed to be for the purposes of the motion, the cause would still not lie for lost future commissions, absent a showing or tortious interference with business relations. Under the circumstances, defendants' actions were at worst negligent. Therefore they lacked the requisite intent for a tortious interference claim. *(See, Alvord & Swift v Muller Constr. Co.,* 46 NY2d 276; *Israel v Wood Dolson Co.,* 1 NY2d

116.) Additionally, to sustain a claim for tortious interference with business relations, unlawful means must be used to disrupt the plaintiff's business. *(See, Sommer v Kaufman,* 59 AD2d 843; *Rosenberg v Del-Mar Div.,* 56 AD2d 576, 577.) On this record, defendants' actions in relation to plaintiff cannot be characterized as unlawful. Nor can plaintiff ground its action on a theory of prima facie tort inasmuch as the exigency of an unprecedented 500-point plunge in stock prices, combined with an unmet margin call, provided sufficient justification for defendants' exercise of their contractual rights to insulate them from liability for prima facie tort.

The second and third causes of action are dismissed for vagueness, with leave to replead. Concur—Murphy, P. J., Kupferman, Ross, Asch and Kassal, JJ.